1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

Z.D., by and through her parents and
guardians, J.D. and T.D., individually, on
behalf of THE TECHNOLOGY ACCESS
FOUNDATION HEALTH BENEFIT
PLAN, and on behalf of similarly situated
individuals,

                    Plaintiffs,

        v.

GROUP HEALTH COOPERATIVE, *et.
al*.,

                    Defendants.

No.  C11-1119RSL

ORDER GRANTING
PLAINTIFFS' MOTIONS FOR
SUMMARY JUDGMENT

        This matter comes before the Court on Plaintiffs' "Motion for Summary

Judgment re: Exhaustion of Administrative Remedies" (Dkt. # 43) and "Motion for

Partial Summary Judgment re: Clarification of Rights to Benefits and Injunctive Relief

under ERISA" (Dkt. # 44).  Plaintiffs ask the Court to find as a matter of law that they

exhausted their administrative remedies or that those remedies would be futile and to

enter a permanent injunction requiring Defendants to comply with the requirements of

Washington's Mental Health Parity Act, RCW 48.46.291, which the Court previously

found to apply.  The Court finds that Plaintiffs have exhausted their administrative

remedies.  It further finds that Plaintiffs are entitled to a permanent injunction requiring

Defendants to adhere to the plain requirements of Washington's Mental Health Parity

Act.  Accordingly, the Court GRANTS both motions.

ORDER GRANTING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT - 1

# I. BACKGROUND

This case concerns a dispute over healthcare benefits.  Plaintiff Z.D. is the twelve-year-old daughter and dependant of Plaintiffs J.D. (her mother) and T.D. (her father).  See Dkt. # 45 at ¶ 2.  She is a beneficiary of "The Technology Access Foundation Health Benefit Plan" (the "Plan"), an ERISA "employee welfare benefit plan," 29 U.S.C. § 1002(1), underwritten and administered by Defendant Group Health Options, Inc.—a wholly owned subsidiary of Defendant Group Health Cooperative.  Amended Complaint (Dkt. # 3) at ¶¶ 1–5.

In 2006, Defendant Group Health diagnosed Z.D. with two DSM-IV-TR mental health conditions:  a "moderate-severe receptive language disorder" and "other specific developmental learning disabilities."  Dkt. # 45 at ¶ 4; see also Dkt. # 49-1 (Exhibit B).[1] At the time of her diagnoses, Z.D. was already a beneficiary of the Plan and began receiving covered non-"restorative"[2] speech therapy treatment for her conditions. Circumstances changed, however, shortly before Z.D.'s seventh birthday.  Plaintiff was told that, per the Plan, non-restorative speech therapy treatments were not covered for individuals over the age of six and thus her treatments would no longer be covered once she turned seven.  Dkt. # 45 at ¶ 5.  As a result, Z.D. stopped going to outpatient therapy, though she did receive some limited treatment services through her public elementary school.  Id. at ¶ 6; Dkt. # 49-1 at 21.

Unfortunately, this limited therapy did not seem to be enough.  Six months after Z.D.'s seventh birthday, her mother complained to Z.D.'s doctor that Z.D. was

---

[1]  The Court notes that this exhibit is sealed and, because it prefers that the present Order be accessible by the public, has not disclosed any information not otherwise available from the parties' public filings.  Nevertheless, throughout this Order the Court will cite to sealed documents that it considered but is not publicly disclosing in order to build a more thorough record in the event of an appeal.

[2]  The Plan distinguishes between "restorative" treatment, which is intended to restore function and is covered regardless of age, and "non-restorative" treatment, which is intended to improve function and is not covered for individuals older than seven.  E.g., Dkt. # 56-1 at 28.

continuing to experience problems at school.  In October 2007, Z.D. was evaluated extensively at the University of Washington's LEARN Clinic, which confirmed Group Health's earlier diagnosis.  Dkt. # 45 at ¶ 6; see Dkt. # 49-1 at 19–37.  Group Health covered this evaluation.  Dkt. # 57 at ¶ 4; Dkt. # 57-1 at 2.

On November 28, 2007, J.D. phoned Group Health to ask if Group Health would cover speech therapy for Z.D.  Dkt. # 50-1 at 83; Opp. (Dkt. # 54) at 8.  According to Group Health's records, it told her that Z.D.'s therapy would not be covered because she was over the age of six.  Dkt. # 50-1 at 83.

In 2008, Z.D.'s parents began paying for her to receive treatment at Bellevue Mosaic in 2008.  Dkt. # 45 at ¶ 7.  In late 2008, Bellevue Mosaic recommended that Z.D. seek a higher level of treatment than it could provide.  Id. at ¶ 8.  Her parents took her to Northwest Language and Learning Center in September 2008.  Id.  Shortly after, J.D. emailed Group Health about coverage.  Dkt. # 45-1 at 6–7.  After she provided some extra information requested by Group Health, id. at 8, she received a formal denial of coverage on December 18, 2008.  Group Health explained that "neurodevelopmental speech therapy is not covered beyond the age of 6" and that Northwest Learning and Language was not a provider within the Group Health system."[3]  Id. at 11.  Z.D.'s parents sent her to the center anyway, paying for her treatment out of pocket beginning in January 2009.  Dkt. # 45 at ¶ 11.

On September 15, 2010, Z.D. received an evaluation from Dr. Deborah Hill.  Id. at ¶ 12.  On October 15, J.D. sent Group Health another letter informing them of its prior age-based denials of her requests for treatment for Z.D. and asking it to reconsider its position.  Dkt. # 45-1 at 18.  She explained that she intended to enroll Z.D. at the Northwest Language and Learning Center and added:  "Please consider this letter to be an appeal of Group Health's denial of my requests for speech therapy and

---

[3]  This rationale is somewhat curious given that Group Health covered Z.D.'s September and October sessions at Northwest.  Dkt. # 57-1 at 4.

1   neurodevelopmental evaluation for my daughter." Id.  She also included a claim for

2   reimbursement for the September 15 evaluation. Id. at 19–21.

3        Group Health responded in a letter dated November 1, 2010. Id. at 23.  It stated

4   that it did not have any record of having denied coverage for the September evaluation

5   and would forward her claim to the claims department.  Id.

6        J.D. responded via a certified letter dated December 9, 2010. Id. at 25.  She

7   wrote that she had not heard anything further from Group Health in regard to either her

8   general request for coverage or her specific claim for the September evaluation.  Id.  She

9   explained that because she had not received any explanation of benefits in regard to her

10   request for coverage, she considered Group Health's inaction to be a denial and wished

11   to appeal that denial.  Id.  Group Health states that it never received that letter.  Opp.

12   (Dkt. # 54) at 11.  It did eventually "cover" the September 15 claim, though.  Compare

13   Dkt. # 45 at ¶ 17 (stating that Group Health paid the claim), with Dkt. # 57 at ¶ 6

14   (stating that Group Health denied coverage because Plaintiffs had used the maximum

15   number of mental health evaluations to which they were entitled, but that Plaintiffs still

16   received the benefit of Group Health's lower rate).

17        In any case, Plaintiffs continued to send Z.D. to Northwest, paying for her

18   therapy themselves.  Dkt. # 45 at ¶ 17.  On July 6, 2011, they filed the instant suit

19   against Defendants, alleging that Washington's Mental Health Parity Act, RCW

20   48.46.291, requires Defendants to cover Z.D.'s mental health therapy sessions.

21   Complaint (Dkt. # 1).  They seek to recover the "benefits due them due to the improper

22   exclusion and/or limitations of behavioral and neurodevelopmental therapy."  Amended

23   Complaint (Dkt. # 3) at ¶¶ 36–38 (relying on 29 U.S.C. § 1132(a)(1)(B)).  And they seek

24   the recovery of all losses to the Plan for Defendants' alleged failure "to act in

25   accordance with the documents and instruments governing the Plan."  Id. at ¶¶ 28–35

26   (relying on 29 U.S.C. § 1132(a)(2) ("breach of fiduciary duty")).  Finally, they ask the

Court to enjoin Defendants from continuing to process and pay claims in a manner inconsistent with RCW 48.46.291.  Id. at ¶¶ 39–41 (relying on 29 U.S.C. § 1132(a)(3)).

After filing suit, Plaintiffs filed a claim for each of Z.D.'s 2011 sessions at Northwest.  Dkt. # 45 at ¶ 17.  Group Health tendered a check in payment of these claims on November 17, 2011.  Id.  In a subsequent deposition, however, Group Health stated that it had erroneously tendered that payment.  Dkt. # 48-1 at 60–61 ("[I]t should not have been paid.").

## II.  DISCUSSION

In the present motions, Plaintiffs argue first that they are entitled to a legal finding that they exhausted their administrative remedies or that those remedies would have been futile.  Dkt. # 43.  Moreover, they ask the Court to enter a permanent injunction against Defendants, enjoining "Group Health from denying coverage for medically necessary neurodevelopmental therapy to treat insureds with DSM-IV-TR mental health conditions simply because the insured is over six years old."  Dkt. # 44.

Notably, the Court may grant Plaintiffs' motions only if it is satisfied that there is no genuine issue of material fact and that judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(c).  As the moving party, Plaintiffs bear the initial burden of informing the Court of the basis for summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  They must prove each and every element of their claims or defenses such that no reasonable jury could find otherwise.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In doing so, they are entitled to rely on nothing more than the pleading themselves.  Celotex, 477 U.S. at 322–24.  Only once they make their initial showing does the burden shift to the Defendants to show by affidavits, depositions, answers to interrogatories, admissions, or other evidence that summary judgment is not warranted because a genuine issue of material fact exists.  Id. at 324.

To be material, the fact must be one that bears on the outcome of the case.  A genuine issue exists only if the evidence is such that a reasonable trier of fact could

resolve the dispute in favor of the nonmoving party.  Anderson, 477 U.S. at 249.  "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  Id. at 249–50.  In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150 (2000).

**A. Exhaustion**

"Section 502 of ERISA entitles a participant or beneficiary of an ERISA-regulated plan to bring a civil action 'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'"  Chappel v. Lab. Corp. of Am., 232 F.3d 719, 724 (9th Cir. 2000) (quoting 29 U.S.C. § 1132(a)(1)(B)).  Before a beneficiary may bring such a claim, though, "exhaustion, at least to the level of the trustees, is ordinarily required where an action seeks a declaration of the parties' rights and duties under the [ERISA] plan."  Graphic Commc'ns Union, Dist. Council No. 2, AFL-CIO v. GCIU-Emp'r Ret. Benefit Plan, 917 F.2d 1184, 1187 (9th Cir. 1990) (emphasis in original) (citations and internal quotation marks omitted).  Suits raising unexhausted claims are barred absent a showing that the relevant unexhausted plan provision is either unenforceable or invalid.  Chappel, 232 F.3d at 724.

Plaintiffs' argument in favor of exhaustion in this case is confined to three occasions:  specifically, that "Group Health failed to (1) timely process and respond to Z.D.'s October 25, 2010 pre[-]service request for coverage of speech therapy; (2) institute any appeal or consideration of a pre-service speech therapy claim in response to Z.D.'s December 9, 2010 request to do so; and (3) timely respond to Z.D.'s September 12, 2011 post-service claim for speech therapy benefits."[4]

---

[4]  Accordingly, the Court does not address Defendants' arguments as to other dates.

In response, Defendants raise three arguments.  First, they contend that Plaintiff's "pre-service" requests were not true "pre-service" requests at all and that Group Health therefore had no obligation to respond.  Second, they contend that Group Health did timely respond to the 2011 claim and that, even if it did not, it has since tendered payment, mooting any claim.  Finally, it argues that Plaintiffs' administrative remedies would not have been be futile.  The Court disagrees with each of Defendants' positions and finds that Plaintiffs are entitled to judgment as a matter of law.  It thus GRANTS the motion (Dkt. # 43).

## 1. Exhaustion of 2010 "Pre-Service" Claims

The facts relevant to Plaintiffs' 2010 "pre-service" requests are straightforward and undisputed:  On October 15, 2010, J.D. sent Group Health a letter that recounted its prior age-based denials of her requests for treatment for Z.D. and immediately added, "Please consider this letter to be an appeal of Group Health's denial of my requests for speech therapy and neurodevelopmental evaluation for my daughter."  Dkt. # 45-1 at 18 (emphasis in original).

She further noted that she had recently had her daughter evaluated again and had been told that she needed to "receive additional medically necessary speech therapy." Id. (emphasis omitted).  She explained that she intended "to enroll Z.D. at Northwest Language and Learning for the recommended speech therapy" and stated:  "I request that Group Health reconsider its exclusion of neurodevelopmental therapy coverage for my daughter and provide her with coverage for neuropsychological evaluation and speech therapy services.  Both neurodevelopmental evaluation and speech therapy are medically necessary services to treat my daughter's developmental disabilities and communication disorder." Id. (emphasis in original).

In its response, Group Health did not address J.D.'s request for speech therapy, stating only that it had no record of having denied any claims arising from a distinct evaluation not at issue here. Id. at 23.  J.D. was not dissuaded.  She wrote back in a

certified letter dated December 9, 2010, stating bluntly that she considered Group

Health's non-response to her request for coverage to be a de facto denial of coverage.

Id. at 25.  She then immediately stated again:  "Please consider this letter to be an appeal

of Group Health's denial of my requests for speech therapy and neurodevelopmental

evaluation for my daughter."  Id. (emphasis in original).

Moreover, eliminating any reasonable objective potential for ambiguity,[5] she

went on to explain that she had "enrolled Z.D. at Northwest Language and Learning for

the recommended speech therapy" and then immediately stated again:  "I request that

Group Health reconsider its exclusion of neurodevelopmental therapy coverage for my

daughter and provide her with coverage for neuropsychological evaluation and speech

therapy services.  Both neurodevelopmental evaluation and speech therapy are

medically necessary services to treat my daughter's developmental disabilities and

communication disorder."  Id. (emphasis in original).

In the face of these plain requests for coverage and notices of appeal, Defendants

argue simply that no response was required because Plaintiffs' requests were not valid

"pre-service" claims, as defined under ERISA.  See Opp. (Dkt. # 54) at 15–18.  They

contend that ERISA places procedural requirements only on a "claim for a benefit under

a group health plan with respect to which the terms of the plan condition receipt of the

benefit, in whole or in part, on approval of the benefit in advance of obtaining medical

care," 29 C.F.R. § 2560.503-1(m)(2), and that, because the Plan does not require pre-

approval of outpatient speech therapy like Z.D. was requesting, her requests did not

constitute pre-service requests.  Opp. (Dkt. # 54) at 15–18.  Technically speaking, the

Court agrees.  J.D.'s letters would not appear to fall within the technical definition of

"Pre-service claims" set forth in the regulation.

---

[5]  To be clear, the Court sees absolutely no factual basis from which to conclude that
reasonable minds could disagree as to the import of J.D.'s correspondences.  Her letters make it
clear beyond any possibility for fairminded disagreement that she was requesting both coverage
for future expected treatment at Northwest and reconsideration of prior denials.

1    Notably, however, that does not mean that the regulation contemplates that

2  Defendants could merely sit on their hands in the face of her requests.  Apart from the

3  specific obligations attached to "pre-service claims," the regulation precludes claim

4  procedures from being "administered in a way, that unduly inhibits or hampers the

5  initiation or processing of claims for benefits." § 2560.503-1(b)(3).  It goes on to

6  specifically provide "that, in the case of a failure by a claimant or an authorized

7  representative of a claimant to follow the plan's procedures for filing a pre-service

8  claim, within the meaning of paragraph (m)(2) of this section, the claimant or

9  representative shall be notified of the failure and the proper procedures to be followed in

10 filing a claim for benefits." § 2560.503-1(c)(1)(i) (emphasis added).  Compare

11 § 2560.503-1(c)(1)(ii) (noting requirements), with Dkt. # 45-1 at 18 (naming "a specific

12 claimant; a specific medical condition or symptom; and a specific treatment . . . for

    which approval is requested").

13   As explained by the Department of Labor, which promulgated the regulation, "a

14 group health plan that requires the submission of pre-service claims, such as requests for

15 preauthorization, is not entirely free to ignore pre-service inquiries where there is a basis

16 for concluding that the inquirer is attempting to file or further a claim for benefits,

17 although not acting in compliance with the plan's claim filing procedures."  U.S.

18 Department of Labor FAQs About the Benefits Claim Procedure Regulations ("DOL

19 FAQs"), available at http://www.dol.gov/ebsa/faqs/faq_claims_proc_reg.html, at A-5

20 (emphasis added).  Rather, "the regulation requires the plan to inform the individual of

21 his or her failure to file a claim and the proper procedures to be followed."  Id.; see

22 Barboza v. Cal. Ass'n of Prof'l Firefighters, 651 F.3d 1073, 1079 (9th Cir. 2011)

23 (deferring to the Secretary of Labor's interpretation of § 2650.503-1 because "[w]hen

24 evaluating conflicting interpretations of an administrative regulation, we are required to

    give 'substantial deference' to the agency's interpretation of its own regulations").

25

26

1    Thus, even assuming that J.D.'s letter was an inappropriate pre-service claim, the

2    Court finds it beyond any possibility for fairminded disagreement that Group Health had

3    "a basis" for concluding that J.D. was "attempting to file or further a claim for benefits."

4    Compare Dkt. # 45-1 at 18, with DOL FAQs, at A-5.  Group Health therefore had an

5    obligation to inform her of the shortcoming of her request—that, as Defendants now

6    contend, it was not an appropriate pre-service claim—and of the proper procedure for

7    filing a claim, i.e., either concurrently or post-service.[6]  Compare § 2560.503-1(c)(1)(i),

8    with Dkt. # 48-1 at 80 (noting that Group Health recognizes pre-service, concurrent, and

9    post-service claims).  Because it failed to do either, Plaintiffs' claims are deemed

10   exhausted.  § 2560.503-1(l) ("In the case of the failure of a plan to establish or follow

11   claims procedures consistent with the requirements of this section, a claimant shall be

12   deemed to have exhausted the administrative remedies available under the plan and shall

13   be entitled to pursue any available remedies under section 502(a) of the Act on the basis

14   that the plan has failed to provide a reasonable claims procedure that would yield a

     decision on the merits of the claim.").

15       Moreover, the fact that the Plaintiffs may not have filed a claim contemplated by

16   § 2560.503-1(m)(2) does not mean that it was not a valid claim under the terms of the

17   Plan itself.  As § 2560.503-1(a) states, it "sets forth minimum requirements for employee

18   benefit plan procedures pertaining to claims for benefits by participants and

19   beneficiaries."  Id. (emphasis added).  It does not preclude a Plan from providing greater

20   protections.  See Chappel, 232 F.3d at 724 (noting the distinction between rights and

21   benefits accorded "by the statutory provisions of ERISA itself" and rights and benefits

22   provided "by the contractual terms of the benefits plan").  And in this case, the Plan does

---

24       [6]  As Plaintiffs point out, Group Health is a fiduciary.  The law does not permit it to
25   simply sit on its hands while a beneficiary unsuccessfully attempts to "navigate the byzantine
     bureaucracy of a health carrier."  Mot. (Dkt. # 43) at 15.  It had a duty to aid J.D. in her
     attempts to present a claim.  See § 2560.503-1(c)(1)(i).

26

1   not expressly incorporate § 2560.503-1(m)(2)'s definition of or otherwise define "pre-

2   service claim."  It simply states:

3       D.  Claims

4           Claims for benefits may be made before or after services are
            obtained.  To make a claim for benefits under the Agreement, a

5           Member (or the Member's authorized representative) must contact
            GHO Customer Service, or submit a claim for reimbursement as

6           described below.  Other inquiries, such as asking a health care
            provider about care or coverage, or submitting a prescription to a

7           pharmacy, will not be considered a claim for benefits.
                                        * * *
8
            GHO will generally process claims for benefits within the
9           following timeframes after GHO receives the claims:
            $   Pre-service claims – within fifteen (15) days.
10          $   Claims involving urgently needed care – within seventy-two
            (72) hours.
11          $   Concurrent care claims – within twenty-four (24) hours.
            $   Post-service claims – within thirty (30) days.
12
13          Timeframes for pre-service and post-service claims can be
            extended by GHO for up to an additional fifteen (15) days.
14          Members will be notified in writing of such extension prior to the
            expiration of the initial timeframe.
15
16  Dkt. # 56-2 at 6 (2010 Plan Benefit Booklet)[7]; accord Dkt. # 56-2 at 59 (2011 Plan

17  Benefit Booklet); see also Dkt. # 56 at ¶ 4 (stating that the 2010 Contract was effective

18  March 1, 2010, and the 2011 Contract was effective March 1, 2011).

19      Undoubtedly recognizing the lack of textual support for its litigation position,

20  Defendants argue that Group Health nonetheless applies the ERISA definition of "pre-

21          [7]  The Court recognizes that the Supreme Court has distinguished between summary
    documents and Plan terms.  CIGNA Corp. v. Amara, 131 S. Ct. 1866, 1878 (2011)
22  ("[S]ummary documents, important as they are, provide communication with beneficiaries
    about the plan, . . . their statements do not themselves constitute the terms of the plan for
23  purposes of § 502(a)(1)(B)." (emphasis omitted)).  Noting that the "GHO Booklets" relied upon
    by the parties themselves state they are "not the contract itself," e.g., Dkt. # 56-2 at 2, 51, the
24  Court directed the parties to file the actual contracts. Dkt. # 69.  The parties subsequently filed
    those documents, pointing out, however, that the contracts themselves do not provide specific
25  terms.  Instead, they incorporate as Plan terms the provisions set forth in the GHO Booklets.
    E.g., Dkt. # 70 at 34 ¶ 1.  The Court therefore treats the Booklet terms as the Plan terms.
26

service" claim.  In support, they offer only the deposition testimony of Carroll Candace,
one of their Rule 30(b)(6) deponents, arguing that she testified that "such claims need to
be 'contractually contingent' on Group Health's advance approval."  Opp. (Dkt. # 54) at
18 (citing Dkt. # 48-1 at 80).  The Court finds no support for that assertion.

      The entirety of the relevant exchange between Ms. Carroll and Plaintiffs' counsel
was as follows:

> Q:  Do you also deal with situations where there is a pre-
> service request for authorization?
>     A:  Yes.
>     Q:  And that's a situation where somebody is asking Group
> Health under the contract to approve benefits before the service has
> been provided, right?
>     A:  Exactly.
>     Q:  And that would then be sort of contractually contingent
> upon Group Health saying, yes, we bless this for payment in
> advance?"
>     A:  Yes
>     Q:  I tend to call those pre-service claims.  Is that what Group
> Health calls them as well?
>     A:  We call them – yes, I technically call them that, but Group
> Health doesn't necessarily do that.  That's a health care reform term.
> So yes, I do use the word claim because ERISA uses the word claim.
>                     * * *
>     A:  It's a claim against benefit pre-service versus a claim to
> pay.
>                     * * *
>     Q:  <u>How does Group Health determine whether an individual
> is making a request for a pre-service claim</u>?
>     A:  <u>The request comes in prior to the delivery of care</u>.

Dkt. # 48-1 at 80 (emphasis added).  As the whole conversation makes clear, Ms. Carroll
not only fails to ever condition her understanding of the Plan term on the <u>need</u> for pre-
approval, she expressly distinguishes Group Health's understanding of its terms from the
statutory definitions.  <u>Id.</u>  Furthermore, when asked point blank to identify how Group
Health determines if "an individual is making a request for a pre-service claim," she
relies on only one condition:  the timing of the claim.  <u>Id.</u>  Accordingly, the Court finds
that Defendants have failed to offer any evidence sufficient to give rise to a genuine issue

as to the import of Group Health's terms.  Anderson, 477 U.S. at 249–50 ("If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted.").  The October 25 letter served as "a claim for benefits under the Agreement" to which Group Health was obligated to respond.

And, of course, Group Health did respond.  Moreover, it did so within the 15-day period set forth by the Plan for "processing" pre-service claims rather than the 30-day post-service review period, further reinforcing its understanding of its own terms' requirements.  Dkt. # 45-1 at 23.  It informed J.D. that it had no record of a denial and advised her that it had "forwarded her information to the claims department for processing."  Id.  Dissatisfied with Group Health's response, J.D. again wrote to appeal Group Health's apparent de facto denial, wisely mailing her letter via certified mail.  Group Health concedes it never responded to that letter, claiming that it never even received it.  Opp. (Dkt. # 54) at 11.  That claim is ultimately insufficient to overcome Plaintiffs' exhaustion contention, however.  Plaintiffs have presented evidence of both their mailing and Group Health's receipt of their December 9, 2010 letter.  Dkt. # 45-1 at 25, 27–28.  In response, Defendants merely assert non-receipt.  And it is settled law that "[m]erely stating that the document isn't in the addressee's files or records . . . is insufficient to defeat the presumption of receipt."  Huizar v. Carey, 273 F.3d 1220, 1223 n.3 (9th Cir. 2001).

Thus, in sum, the Court finds that, in addition to being able to claim the benefit of the automatic exhaustion provision of § 2560.503-1(l), Plaintiffs fulfilled their exhaustion obligations under the Plan itself.  They both presented their 2010 claims to Group Health as the Plan terms required and subsequently appealed Group Health's de facto denial.  Accordingly, under either theory, the Court finds that Plaintiffs 2010 claims are exhausted.  See Barboza, 651 F.3d at 1076 ("[T]he 'applicability *vel non* of exhaustion principles is a question of law' that 'we consider . . . de novo.'").

1

## 2. Exhaustion of the 2011 Claim

2    Next, the Court whether Plaintiffs exhausted their 2011 post-service claim.

3    Notably, Group Health tendered a check in partial payment of these claims on

4  November 12, 2011—60 days after the claim was filed.  See Dkt. # 57-2 at 4 (noting that

5  Group Health paid $609.00 of the $810.00 claimed).  The only amount it declined to pay

6  was Plaintiffs' Plan-designated co-pay amount.  Accordingly, Defendants assert that

7  there is no adverse benefit determination to appeal.  Plaintiffs disagree.  They assert that

8  Group Health's decision not to pay the entirety of the claim constituted an "adverse

9  benefit determination."  Dkt. # 62 at 10–11.  And, because Group Health did not provide

10  them with notice of that adverse decision within 30 days of its receipt of their claim as

11  required by § 560.503-1(f)(2)(iii)(B), the automatic exhaustion provisions of

§ 2560.503-1(l) were triggered.[8]  The Court agrees.

12    While Defendants are correct in their assertion that "the regulation does not

13  address the periods within which payments that have been granted must be actually paid

14  or services that have been approved must be actually rendered," DOL FAQs, at A-10,

15  that is not the crux of Plaintiffs' claim.  To the contrary, Plaintiffs note that the regulation

16  defines "adverse benefit determination" as any "failure to provide or make payment (in

17  whole or in part)."  § 2560.503-1(m)(4) (emphasis added).  They argue that this includes

18  even denials based on the imposition of co–pays, pointing out that this is the official

19  position of the Department of Labor.  DOL FAQs, at C-12 (answering the question, "If a

20  claimant submits medical bills to a plan for reimbursement or payment, and the plan,

21  applying the plan's limits on co-payment, deductibles, etc., pays less than 100% of the

22  medical bills, must the plan treat its decision as an adverse benefit determination?" in the

23

24    [8]  Plaintiffs also complain that Group Health has since indicated that it should not have
paid any of the claim.  See Dkt. # 48-1 at 50–61 (statement by one of Defendants' Rule
30(b)(6) deponents, Dean Solis, the acting associate of "Western Washington Health Plan

25  Operations," that Group Health should not have paid the claim).  As a result, Plaintiffs rightly
fear that Group Health could seek to clawback those funds at any time.

26

affirmative because "[i]n any instance where the plan pays less than the total amount of expenses submitted with regard to a claim, while the plan is paying out the benefits to which the claimant is entitled under its terms, the claimant is nonetheless receiving less than full reimbursement of the submitted expenses."). The Court sees no reason not to defer to this interpretation. See Barboza, 651 F.3d at 1079.

Thus, the undisputed fact that Group Health did not pay the entirety of the claim constituted a partial denial of benefits and thus an adverse benefits determination. § 2560.503-1(m)(4). Accordingly, Group Health was required to inform Plaintiffs of this partial denial within 30 days of receiving the claim. § 560.503-1(f)(2)(iii)(B). Plaintiffs assert that it failed to do so, and, in response, Defendants essentially concede the point. Accordingly, the Court finds that Plaintiffs' 2011-based claim is exhausted.

### 3. Futility

Because the Court finds that Plaintiffs exhausted both of the claims that are the subject of this motion, it does not reach the issue of futility.

Notably, though, the Court wishes to point out that Defendants' position on futility—that administrative remedies may not have been futile because, despite the fact that the Plan does not permit coverage of non-restorative mental health therapies for individuals over the age of six,[9] Group Health sometimes paid them anyway—is troubling. As Plaintiffs point out, ERISA fiduciaries are not permitted to process claims on a whim. Rather, they are required to do precisely the opposite: "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . in accordance with the documents and instruments governing the

---

[9] To be clear, the Court agrees with Plaintiffs that Defendants' official position throughout this litigation has been that the Plan "required Group Health to deny neurodevelopmental therapy benefits for claimants over six years old," Dkt. # 19 at 7, and that the record is replete with examples of Defendants asserting Group Health's official position. See, e.g., Mot. (Dkt. # 43) at 21–27 (summarizing the many instances in which Group Health asserted its official position); Reply (Dkt. # 62) at 5–8 (same). Certainly, Defendants filed two motions premised on that position. Dkt. ## 7, 31. It is the entire reason this case exists.

plan insofar as such documents and instruments are consistent with the provisions of

[ERISA]."  29 U.S.C. § 1104(a)(1)(D).  Moreover,

> The claims procedures for a plan will be deemed to be reasonable
> only if . . . [t]he claims procedures contain administrative processes
> and safeguards designed to ensure and to verify that benefit claim
> determinations are made in accordance with governing plan
> documents and that, where appropriate, the plan provisions have
> been applied consistently with respect to similarly situated claimants.

29 C.F.R. § 2560.503-1(b)(5).

Thus, in attempting to win the exhaustion battle, Defendants essentially concede

the war by representing to this Court that Group Health deviates from the Plan's terms to

pay claims not permitted under the Plan contract.  E.g., Opp. (Dkt. # 54) at 23

("Notwithstanding Group Health's policy limiting speech benefits to children under 7,

the record shows that in Z.D.'s case Group Health paid speech therapy claims when she

submitted them. . . .  But even though those payments may have been 'error' in the sense

that they were inconsistent with the TAF Contract, that 'error' has benefitted Plaintiffs

every time . . . .").  The Court has no choice but to treat this representation as a

concession that Group Health is administering the Plan in an arbitrary and capricious

fashion, i.e., that it is wholly failing to act as a fiduciary.

**B.  Injunctive Relief**

The Court next considers Plaintiffs' motion for "an order and judgment under

ERISA clarifying that neurodevelopmental therapy to treat insureds with DSM-IV-TR

mental health conditions may not be denied simply because the insured is over the age of

six" and "enjoin[ing] Group Health from denying coverage for medically necessary

neurodevelopmental therapy to treat insureds with DSM-IV-TR mental health conditions

simply because the insured is over six years old."  Mot. (Dkt. # 44) at 7.

In opposition, Defendants raise three arguments:  First, that "Group Health treats

all neurodevelopmental disorders the same"; second, that "Plaintiffs' own experience

demonstrates the lack of an actual or imminent injury"; and third, that "the

Neurodevelopmental Therapies Mandate specifically permits terminating speech therapy at age 7." Opp. (Dkt. # 53) at 15. The Court finds none persuasive. Rather, it finds that no genuine issue of material fact exists and that Plaintiffs are entitled to judgment as a matter of law under 29 U.S.C. § 1132(a)(1)(B) and (a)(3). It thus GRANTS Plaintiffs' motion (Dkt. # 44).

### 1. Revisiting the Neurodevelopmental Therapies Mandate Issue

The Court thinks it prudent to start with Defendant's third argument: their third attempt to convince this Court that "the Neurodevelopmental Therapies Mandate specifically permits terminating speech therapy at age 7" and that the Mental Health Parity Act must therefore be interpreted in such a fashion that it does not require neurodevelopmental therapy coverage. Opp. (Dkt. # 53) at 15. As the Court stated in its prior resolution of this same argument,[10] the issue is not whether the Mandate requires coverage. Plainly it does not. Neither is there any dispute as to whether the Mental Health Parity Act repealed the Mandate. Again, plainly it did not. The only issue is whether the two statutes conflict, and as the Court has found on two separate occasions, they do not. Order (Dkt. # 30) at 8; Order (Dkt. # 36) at 2–3.

The previously enacted Mandate required "coverage for neurodevelopmental therapies for covered individuals age six and under." RCW 48.44.450(1). It established a coverage floor, not a ceiling. Thus, the subsequently enacted Mental Health Parity Act merely imposed an additional, distinct requirement that mental health coverage "be delivered under the same terms and conditions as medical and surgical services." H.B. 1154, 59th Leg., Reg. Sess., ¶ 1 (Wash. 2005); see, e.g., Order (Dkt. # 30); Order (Dkt. # 36). There does not exist even a close question as to whether there is a conflict between

_____

[10]  The Court disagrees with Defendants' representations regarding the "newness" of their argument. As before, Defendants contend that the Neurodevelopmental Therapies Mandate does not require coverage after an individual turns seven. As before, they argue that the Mental Health Parity Act did not repeal the Neurodevelopmental Therapies Mandate. And, as before, they contend that the two statutes conflict and that the Mandate trumps the Parity Act. There is nothing materially new about Defendants' argument.

1    the statutes under established Washington law.[11]

2         In any case, as it appears that the message has yet to be received, the Court wishes

3    to be clear:  The coverage at issue in this case is the product of RCW 48.46.291, not the

4    Neurodevelopmental Therapies Mandate.  The Mandate continues to apply, requiring

5    "coverage for neurodevelopmental therapies for covered individuals age six and under."

6    RCW 48.44.450(1).  And while the Mandate no longer applies after a child turns seven,

7    RCW 48.46.291 does.  By its plain terms, it requires health maintenance organizations

8    like Group Health to provide coverage for "mental health services" at increasing levels

9    of parity with the coverage such entities provide for medical and surgical services.  See

10   RCW 48.46.291(2)(a)–(c).

### 2. Statutory Treatment Requirements

11        The Court next considers Defendants' contention that, since January 2011, they

12   have brought their policies in conformity with the Mental Health Parity Act and that an

13   injunction is therefore unnecessary.[12]  Opp. (Dkt. # 53) at 17.  The Court disagrees.

14        The Court notes at the outset that Defendants paint a much rosier picture of their

15   policies in their briefs than they apply in practice.  For example, Defendants argue that

16   they are in compliance with RCW 48.46.291(2)(c) because Group Health applies the

17   same treatment limitations to mental health therapy services that it applies to all therapies

18   services.  Opp. (Dkt. # 53) at 16 ("Group Health imposes a treatment limit (age seven) on

19   a limited set of therapies (speech therapy, physical therapy and occupational therapy)

20   that treat medical and mental conditions alike.").  In actuality, however, Group Health

21   does not apply an age-based treatment limitation across the board to all therapies related

---

22   [11]  A litany of Washington state courts have held the same.  See, e.g., D.F. v. Wash.
     State Health Care Auth., No. 10-2-294007 SEA; Dkt. ## 74, 74-1 (listing decisions).

23

24   [12]  The Court notes that Defendants mischaracterize Plaintiffs' request.  To be clear,
     Plaintiffs do not request that the Court find that an age limit is never appropriate under any
     circumstance.  Opp. (Dkt. # 53) at 15–16.  They assert only that Group Health cannot impose
25   an age-based treatment limitation on neurodevelopmental therapies unless it generally imposes
     that same limit on "medical and surgical services."

26   ORDER GRANTING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT - 18

to medical and surgical services.  See Dkt. # 56-2 at 82 (2011 terms).[13]  It applies an age-

---

[13]  The Plan states:

**G.  Rehabilitation Services.**

1.  Rehabilitation services are covered as set forth in this section, limited to the following:  physical therapy; occupational therapy; massage therapy; and speech therapy to restore function following illness, injury or surgery.  Services are subject to all terms, conditions and limitations of the Agreement including the following:

a.  All services require a prescription from either a MHCN or community physician and must be provided by a MHCN-approved or Community Provider rehabilitation team that may include medical, nursing, physical therapy, occupational therapy, massage therapy and speech therapy providers.

b.  Under the Community Provider option, inpatient rehabilitation services must be authorized in advance by GHO.

c.  Services are limited to those necessary to restore or improve functional abilities when physical, sensori-perceptual and/or communication impairment exists due to injury, illness or surgery. Such services are provided only when significant, measurable improvement to the Member's condition can be expected within a sixty (60) day period as a consequence of intervention by covered therapy services described in paragraph a., above.

d.  Coverage for inpatient and outpatient services is limited to the Allowance set forth in the Allowances Schedule.

Excluded:  inpatient Residential Treatment services; specialty rehabilitation programs; long-term rehabilitation programs; physical therapy, occupational therapy and speech therapy services when such services are available (whether application is made or not) through programs offered by public school districts; therapy for degenerative or static conditions when the expected outcome is primarily to maintain the Member's level of functioning (except as set forth in subsection 2. below); recreational, life-enhancing, relaxation or palliative therapy; implementation of home maintenance programs; programs for treatment of learning problems; any services not specifically included as covered in this section; and any services that are excluded under Section V.

**2.  Neurodevelopmental Therapies for Children Age Six (6) and**

based limitation only to a narrow subcategory of medical and surgical services, namely, non-rehabilitative therapies—"therapy for degenerative or static conditions when the expected outcome is primarily to maintain the Member's level of functioning," as opposed to "restore function following illness, injury or surgery." Id. (emphasis added). Thus, in reality, Group Health applies its age-based limitation to only a sub-category of a sub-category of its covered services: non-rehabilitative, therapy services.

In any case, the end result of Group Health's actions is simple. As Defendants concede, "Group Health's 'official policy'" remains to terminate "neurodevelopmental therapies at age seven." Opp. (Dkt. # 53) at 16 ("The plain language of the TAF Contract makes this equal treatment clear: the Neurodevelopmental Therapies benefit does not distinguish between types of conditions, but simply grants coverage for neurodevelopmentally disabled children (regardless of whether the neurodevelopmental disability is "mental" or "physical"), subject to common treatment limitations (e.g., no coverage after age six)."). They defend this practice by pointing to a single line of RCW 48.46.291(2)(c): "Treatment limitations or any other financial requirements on coverage

---

**Under.** Physical therapy, occupational therapy and speech therapy services for the restoration and improvement of function for neurodevelopmentally disabled children age six (6) and under shall be covered. Coverage includes maintenance of a covered Member in cases where significant deterioration in the Member's condition would result without the services. Coverage for inpatient and outpatient services is limited to the Allowances set forth in the Allowances Schedule.

Excluded: inpatient Residential Treatment services; specialty rehabilitation programs; long-term rehabilitation programs; physical therapy, occupational therapy and speech therapy services when such services are available (whether application is made or not) through programs offered by public school districts; recreational, life-enhancing, relaxation or palliative therapy, implementation of home maintenance programs; programs for treatment of learning problems; any services not specifically included as covered in this section; and any services that are excluded under Section V.

Dkt. # 56-2 at 82 (some emphasis omitted).

for mental health services are only allowed if the same limitations or requirements are imposed on coverage for medical and surgical services . . . ." They contend that because Group Health essentially excludes all non-restorative "rehabilitative therapies related to medical and surgical services," it may similarly exclude all coverage for similar non-restorative mental health or neurodevelopmental disorders. See Opp. (Dkt. # 53) at 17.

The Court finds two problems with this interpretation. First, Defendant's interpretation ignores the full text of RCW 48.46.291. Even the subsection containing the clause relied upon by Defendants states plainly:

> (2) <u>All health benefit plans offered by health maintenance organizations that provide coverage for medical and surgical services shall provide</u>:
>
> (c) For all health benefit plans delivered, issued for delivery, or renewed on or after July 1, 2010, <u>coverage for</u>:
>
> (i) <u>Mental health services</u>.  The copayment or coinsurance for mental health services may be no more than the copayment or coinsurance for medical and surgical services otherwise provided under the health benefit plan.  Wellness and preventive services that are provided or reimbursed at a lesser copayment, coinsurance, or other cost sharing than other medical and surgical services are excluded from this comparison.  If the health benefit plan imposes a maximum out-of-pocket limit or stop loss, it shall be a single limit or stop loss for medical, surgical, and mental health services.  If the health benefit plan imposes any deductible, mental health services shall be included with medical and surgical services for the purpose of meeting the deductible requirement.  Treatment limitations or any other financial requirements on coverage for mental health services are only allowed if the same limitations or requirements are imposed on coverage for medical and surgical services . . . .

RCW 48.46.291(2)(c)(i) (emphasis added).  And the statute defines "mental health services" as "medically necessary outpatient and inpatient services provided to treat mental disorders covered by the diagnostic categories listed in the most current version of the diagnostic and statistical manual of mental disorders, published by the American

psychiatric association," with exceptions not at issue here.  RCW 48.46.291(1).  Thus, the Act plainly imposes a baseline coverage requirement requiring Group Health "provide . . . coverage for" Z.D.'s "medically necessary" treatment for her DSM-IV-TR mental health conditions without any regard for whether that treatment is restorative or non-restorative.  RCW 48.46.291(2)(c)(i); see RCW 48.46.291(2)(a)(i), (b)(i).[14]

Second, Defendants' focus on the final clause of subsection (c)(i) ignores the history and structure of the statute.  As enacted, the statute is meant to impose increasingly stringent requirements on entities like Group Health every two years.  RCW 48.46.291(2)(a)–(c).  Thus, the addition of the treatment limitation is not meant to weaken or supplant the baseline coverage requirement; it is meant to bolster it by further limiting the conditions an entity like Group Health can impose on its coverage of mental health conditions like Z.D.'s.  Id.  In short, the clause precludes Group Health from imposing precisely the sort of tailored limitations at issue here—limitations that would defeat the very purpose of the statute:  providing coverage.

In sum then, the Court finds that RCW 48.46.291(2)(c)(i) requires Group Health to provide coverage for "medically necessary outpatient and inpatient services provided to treat mental disorders covered by the diagnostic categories listed in the most current version of the diagnostic and statistical manual of mental disorders, published by the American psychiatric association," with those limited exceptions set forth in the statute, RCW 48.46.291(1).  And it finds that the final clause of subsection (c)(i) only further precludes Group Health from imposing treatment limitations it does not generally "impose[] on coverage for medical and surgical services."  RCW 48.46.291(2)(c)(i).  Accordingly, because Group Health does not exclude individuals over the age of six

---

[14]  This interpretation is also supported by the Washington Senate Bill Report for the Parity Act, which states: "**Background:**  Current Washington law does not require health carriers to include mental health coverage in any benefit plan. . . .  **Summary of Bill:**  Beginning January 1, 2006[,] a health benefit plan that provides coverage for medical and surgical services must provide coverage for mental health services and prescription drugs to treat mental disorders."  Dkt. # 9 at 40–41.

from coverage for medical and surgical services or even impose an age-based limitation on its therapy coverage in general, it may not impose that limitation on non-restorative mental health therapy coverage.[15]

### 3. Actual or Imminent Injury

Finally, the Court turns to Defendants' contention that Plaintiffs cannot show a likelihood of irreparable injury.

The crux of Defendants' position is, again, that regardless of Group Health's actual policies, they may in fact pay future claims.[16]  As Defendants state: "Apart from Group Health's policies, Plaintiffs' actual experience with Group Health's claims practice belies their claim that Group Health 'systematic[ally] violates . . . plan terms' or will do so in the future."  See Opp. (Dkt. # 53) at 17.

First and foremost, this contention is patently deficient as a matter if law.  As stated, ERISA requires "a fiduciary [to] discharge his duties with respect to a plan solely . . . in accordance with the documents and instruments governing the plan."  29 U.S.C. § 1104(a)(1)(D).  Accordingly, it is no excuse for Defendants to represent that the Plan precludes the coverage sought, and yet simultaneously argue that, "[w]hile there may be some discrepancy between Group Health's practice and its official policy toward neurodevelopmental therapies, . . . its practice has changed in Plaintiffs' favor, suggesting a strong likelihood of future coverage."  Opp. (Dkt. # 53) at 20.  The Court will not leave Plaintiffs at the mercy of Group Health's plainly arbitrary application of its own Plan terms or its ever-evolving understanding of Plaintiffs' entitlement to coverage.

---

[15]  Accordingly, it would also seem that Group Health cannot condition coverage on the availability of treatment through "programs offered by public school districts."  Cf. Dkt. # 56-2 at 82 (2011 terms).

[16]  Defendants also contend that Plaintiffs conceded that they have no plans to start speech therapy again. Opp. (Dkt. # 53) at 19.  As they concede, though, that is no longer the case.  Id.  Moreover, as the entirety of the record in this case makes clear, every doctor who has evaluated Z.D. has recommended that she get treatment.  And her parents' desire to follow doctor's recommendations is the impetus for this case.

Moreover, Group Health's boots on the ground clearly do not share the same impression as its lawyers as to Plaintiffs' likelihood of future coverage.  As one of its regional managers, Tomi McVay, testified in her role as Rule 30(b)(6) deponent:

> Q:  So if a person comes to you who is age seven, has a neurodevelopmental problem, disorder—let's go even further and say that they have diagnosed DSM-IV-TR diagnoses as well.
>
> * * *
>
> The person then comes to you and says, "I understand that I'm not covered under the neurodevelopmental benefit because I'm age seven, am I covered under the rehab benefit?"
> And the first thing you do [is] determine whether they are trying to improve their function or restore function?  Is that what goes on clinically?
> A:  I do an evaluation and I send it to clinical review.
> Q:  And if the evaluation concludes that they're seeking speech therapy to not just restore previous function but to improve function, your expectation is that Group Health would determine that to be not medically necessary?
>
> * * *
>
> A:  Typically, yes.
> Q:  And that's your current understanding up to today, is that correct?
> A:  Yes. . . .

Dkt. # 64 at 27.  Furthermore, she goes on to note that there have been "[l]ess than seven" cases in which treatment has continued to be covered after the individual turned seven.  Id.  It thus appears that both Defendants' policies and its practices do not favor Plaintiffs' chances of obtaining the coverage to which she is entitled absent an injunctive order—acutely demonstrating the need for the Court "to clarify [Plaintiffs'] rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

* * *

In sum, the Court finds (1) that RCW 48.46.291 is effective against Group Health, (2) that neither Group Health's policies nor its practices adhere to the statute's mandates, and (3) that Plaintiffs have more than demonstrated a substantial likelihood of harm absent injunctive relief.  Accordingly, the Court GRANTS Plaintiffs' motion for declaratory and injunctive relief under § 1132(a)(1)(B) and (a)(3).  The Court ORDERS

Defendants to cease denying coverage for medically necessary neurodevelopmental therapy to treat insureds with DSM-IV-TR mental health conditions simply because the insured is over six years old.  Moreover, the Court ORDERS Defendants to cease their application of any treatment limitations that are not generally "imposed on coverage for medical and surgical services."  RCW 48.46.291(2)(c)(i).  The Court will not look kindly on failures to immediately implement its directive.

## III.  CONCLUSION

For all of the foregoing reasons, the Court GRANTS Plaintiffs' "Motion for Summary Judgment re: Exhaustion of Administrative Remedies" (Dkt. # 43) and "Motion for Partial Summary Judgment re: Clarification of Rights to Benefits and Injunctive Relief under ERISA" (Dkt. # 44).

Plaintiffs exhausted their 2010 and 2011 claims and have demonstrated as a matter of law that Group Health's policies and its actions fail to comport with the plain requirements of Washington's Mental Health Parity Act.  Accordingly, they are entitled to declaratory relief.  Moreover, because they have demonstrated a strong likelihood of future irreparable injury absent injunctive relief, the Court ORDERS Defendants to immediately cease denying coverage for medically necessary neurodevelopmental therapy to treat insureds with DSM-IV-TR mental health conditions simply because an insured is over six years old.  Defendants must immediately cease their application of any treatment limitations that are not generally "imposed on coverage for medical and surgical services."  RCW 48.46.291(2)(c)(i).

DATED this 1st day of June, 2012.

_MWT S Lasnik_
Robert S. Lasnik
United States District Judge